CAUSE NO. 19-15508

| | | |
|---|---|---|
| BBVA USA, AS AGENT, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| NORTHSTAR HEALTHCARE | § | |
| ACQUISITIONS, L.L.C., NOBILIS | § | |
| HEALTH CORP., ATHAS | § | 44ᵗʰ JUDICIAL DISTRICT |
| ADMINISTRATIVE LLC, ATHAS | § | |
| HEALTH LLC, ATHAS HOLDINGS | § | |
| LLC, CENTRAL DALLAS | § | |
| MANAGEMENT LLC, CENTRAL | § | |
| MEDICAL SOLUTIONS LLC, | § | |
| CHANDLER SURGERY CENTER, LLC, | § | |
| CONCERTIS, LLC, DOWNTOWN | § | |
| DALLAS SURGERY CENTER, LLC, | § | |
| FIRST NOBILIS, LLC, FIRST NOBILIS | § | |
| HOSPITAL MANAGEMENT, LLC, | § | |
| HOUSTON MICROSURGERY | § | |
| INSTITUTE, LLC, MARSH LANE | § | |
| SURGICAL HOSPITAL, LLC, MPDSC, | § | |
| LLC, NHC ARIZONA PROFESSIONAL | § | |
| ASSOCIATES, LLC, NOBILIS | § | |
| ARIZONA HOLDING COMPANY LLC, | § | |
| NOBILIS HEALTH MARKETING, LLC, | § | |
| NOBILIS SURGICAL ASSIST, LLC, | § | |
| NOBILIS VASCULAR HOLDING | § | |
| COMPANY, LLC, NOBILIS | § | |
| VASCULAR TEXAS, LLC, NORTH | § | |
| PHOENIX ASC MANAGEMENT, LLC, | § | |
| NORTHSTAR HEALTHCARE | § | |
| GENERAL PARTNER, LLC, | § | |
| NORTHSTAR HEALTHCARE | § | |
| HOLDINGS, INC., NORTHSTAR | § | |
| HEALTHCARE LIMITED PARTNER, | § | |
| LLC, NORTHSTAR HEALTHCARE | § | |
| MANAGEMENT COMPANY, LLC, | § | |
| NORTHSTAR HEALTHCARE SUBCO, | § | |
| LLC, NORTHSTAR HEALTHCARE | § | |
| SURGERY CENTER – SCOTTSDALE, | § | |
| LLC, ORACLE SURGERY CENTER, | § | |
| LLC, PEAK NEUROMONITORING | § | |
| ASSOCIATES TEXAS, LLC, PEAK | § | |

NEUROMONITORING ASSOCIATES §
TEXAS II, LLC, PEAK SURGEON §
INNOVATIONS, LLC, PHOENIX §
SURGERY CENTER, LLC, PLANO §
SURGICAL MANAGEMENT, LLC, §
PREMIER HEALTH SPECIALISTS, §
LLC, PSH MANAGEMENT, LLC, §
SOUTHWEST FREEWAY SURGERY §
CENTER, LLC, SOUTHWEST §
FREEWAY SURGERY CENTER §
MANAGEMENT LLC, SOUTHWEST §
HOUSTON SURGICAL ASSIST, LLC, §
THE PALLADIUM FOR SURGERY – §
DALLAS LTD., THE PALLADIUM FOR §
SURGERY HOUSTON, LTD., §
BELLAIRE SURGICAL HOSPITAL §
HOLDINGS, LLC, FIRST NOBILIS §
HOSPITAL, LLC, FIRST NOBILIS §
SURGICAL CENTER, LLC, HERMANN §
DRIVE SURGICAL HOSPITAL, LP, §
HOUSTON SURGICAL §
MANAGEMENT, LLC, NOBILIS §
UPTOWN HOLDINGS, LLC, AND §
PERIMETER ROAD SURGICAL §
HOSPITAL, LLC, §
§
§
**Defendants.** §

## ORDER IMMEDIATELY APPOINTING TEMPORARY RECEIVER, GRANTING TEMPORARY RESTRAINING ORDER, AND ORDERING TURNOVER OF COLLATERAL TO THE RECEIVER

On the 24th day of September 2019, the Court considered the Verified Original Petition

And Application For Temporary Restraining Order, Preliminary and Permanent Injunction, and

For the Immediate Appointment of Temporary Receiver (the "Original Petition") of the Plaintiff

BBVA USA f/k/a Compass Bank, as administrative agent (the "Administrative Agent") under

the Credit Agreement (as defined below) and as super priority agent (the "Super Priority Agent"

and together with the Super Priority Agent, the "Agent") under the Super Priority Credit

Agreement (as defined below) (in such capacities, the "Plaintiff"), seeking:

(a)     immediate appointment of temporary receiver to take immediate control over the assets of each of the Defendants (i) Northstar Healthcare Acquisitions, L.L.C., (ii) Nobilis Health Corp., (iii) Athas Administrative LLC, (iv) Athas Health LLC, (v) Athas Holdings LLC, (vi) Central Dallas Management LLC, (vii) Central Medical Solutions LLC, (viii) Chandler Surgery Center, LLC, (ix) Concertis, LLC, (x) Downtown Dallas Surgery Center, LLC, (xi) First Nobilis, LLC, (xii) First Nobilis Hospital Management, LLC, (xiii) Houston Microsurgery Institute, LLC, (xiv) Marsh Lane Surgical Hospital, LLC, (xv) MPDSC, LLC, (xvi) NHC Arizona Professional Associates, LLC, (xvii) Nobilis Arizona Holding Company LLC, (xviii) Nobilis Health Marketing, LLC, (xix) Nobilis Surgical Assist, LLC, (xx) Nobilis Vascular Holding Company, LLC, (xxi) Nobilis Vascular Texas, LLC, (xxii) North Phoenix ASC Management, LLC, (xxiii) Northstar Healthcare General Partner, LLC, (xxiv) Northstar Healthcare Holdings, Inc., (xxv) Northstar Healthcare Limited Partner, LLC, (xxvi) Northstar Healthcare Management Company, LLC, (xxvii) Northstar Healthcare Subco, LLC, (xxviii) Northstar Healthcare Surgery Center – Scottsdale, LLC, (xxix) Oracle Surgery Center, LLC, (xxx) Peak Neuromonitoring Associates Texas, LLC, (xxxi) Peak Neuromonitoring Associates Texas II, LLC, (xxxii) Peak Surgeon Innovations, LLC, (xxxiii) Phoenix Surgery Center, LLC, (xxxiv) Plano Surgical Management, LLC, (xxxv) Premier Health Specialists, LLC, (xxxvi) PSH Management, LLC, (xxxvii) Southwest Freeway Surgery Center, LLC, (xxxviii) Southwest Freeway Surgery Center Management LLC, (xxxix) Southwest Houston Surgical Assist, LLC, (xl) The Palladium for Surgery – Dallas Ltd., (xli) The Palladium for Surgery Houston, Ltd., (xlii) Bellaire Surgical Hospital Holdings, LLC, (xliii) First Nobilis Hospital, LLC, (xliv) First Nobilis Surgical Center, LLC, (xlv) Hermann Drive Surgical Hospital, LP, (xlvi) Houston Surgical Management, LLC, (xlvii) Nobilis Uptown Holdings, LLC, and (xlviii) Perimeter Road Surgical Hospital, LLC (collectively, the "Defendants"), and the books, papers, and records of the Defendants[1] to the extent related to such assets; and

(b)     a temporary restraining order and/or temporary injunction against the Defendants, filed by the Plaintiff.

Under the operative Loan Documents (as defined below), the Agent is entitled to the appointment of a receiver upon and during the continuation of any Event of Default; and numerous Events of Default have occurred and are continuing.

Having considered the Original Petition, ~~any responses thereto~~ *no response having been filed or appearance by counsel made*, the evidence, the arguments of counsel, if any, and the applicable law, the Court finds that the request for a temporary restraining order and appointment of a receiver in the Original Petition are well-taken,

---

[1] The books, papers and records of the Defendants also constitute the "Collateral" of the Plaintiff, as more fully described herein.

and both are **GRANTED** and, for the reasons set forth below, the following orders should be entered:

## I.   FINDINGS IN SUPPORT OF ORDER

The Court finds as follows:

### A.   THE CREDIT AGREEMENTS AND LOAN DOCUMENTS.

1.    On or about October 28, 2016, the Defendant Northstar Healthcare Acquisitions, L.L.C., as borrower (the "Borrower") and the other Defendants party thereto, as loan parties, entered into that certain Credit Agreement with the Administrative Agent, and the lenders party thereto from time to time (the "Lenders") (as amended, supplemented, or otherwise modified from time to time, the "Credit Agreement"), as amended and modified by (1) that certain Amendment No. 1 to Credit Agreement and Waiver, dated as of March 3, 2017, (2) that certain Amendment No. 2 to Credit Agreement, dated as of November 15, 2017, (3) that certain Second Limited Conditional Waiver and Amendment No. 3 to Credit Agreement, dated effective as of December 31, 2018, (4) that certain Second Limited Conditional Forbearance Agreement, Consent and Fourth Amendment to Credit Agreement, dated as of April 30, 2019, and (5) those certain Joinder Agreements, executed and delivered from time to time by the Defendants to join such Defendants as loan parties to the Credit Agreement (collectively, the "Joinders"). True and correct copies of the Credit Agreement, all amendments thereto, and each of the Joinders, are attached to the Original Petition, collectively, as Exhibit "A", and are incorporated herein for all purposes.

2. On or about May 23, 2019, the Borrower, as borrower, and certain of the Defendants party thereto, as loan parties, entered into that certain Super Priority Credit Agreement (as amended, supplemented, or otherwise modified from time to time, the "Super Priority Credit Agreement" and together with the Credit Agreement, the "Credit Agreements") dated effective

May 22, 2019, with the Lenders party thereto and the Plaintiff, as super priority agent, as amended by that certain Limited Conditional Waiver and Amendment No. 1 to Super Priority Credit Agreement, dated effective as of July 31, 2019. True and correct copies of the Super Priority Credit Agreement and all amendments thereto are attached to the Original Petition, collectively, as Exhibit "B", and are incorporated herein for all purposes.

3. In accordance with the terms of the Credit Agreements and the Existing Loan Documents (capitalized terms used but not otherwise defined herein shall have the meanings specified in the Credit Agreements and Loan Documents, as applicable) and Super Priority Loan Documents (collectively, the "Loan Documents"), the Borrower promised to pay to the Plaintiff and the Lenders all amounts advanced thereunder, together with interest thereon and such other amounts owing by the Borrower to the Plaintiff and the Lenders in accordance with the terms thereof.

4. Pursuant to the terms and conditions of the Credit Agreements and the Loan Documents, the Plaintiff and the Lenders provided the Borrower with (i) a revolving credit facility in a maximum principal amount of $30,000,000 in accordance with the terms thereof, (ii) a term "A" loan in the original principal amount of $52,500,000, (iii) a term "B" loan in the original principal amount of $50,000,000, and (iv) a super priority term loan in the original principal amount of $7,750,000 (collectively, the "Loans").

5. There is evidence that the unpaid balance of the indebtedness owed under the Loan Documents, as of September 1, 2019, is no less than $140 million (the "Indebtedness").

**B.   THE GUARANTY AND SECURITY AGREEMENTS AND COLLATERAL THEREUNDER**

6. On or about October 28, 2016, to secure the Defendants' obligations to the Administrative Agent and the Lenders under the Credit Agreement and Loan Documents, including the payment of the indebtedness thereunder, the Borrower and certain of the other

Defendants, as grantors and guarantors, and the Administrative Agent executed and delivered that certain Guaranty and Security Agreement, dated as of October 28, 2016 (as amended, supplemented, or otherwise modified from time to time, "Guaranty and Security Agreement"), as amended and modified by (1) that certain Reaffirmation and Omnibus Amendment Agreement (the "Omnibus Agreement"), dated as of May 22, 2019, and (2) the Joinder Agreements pursuant to which certain of the Defendants joined the Guaranty and Security Agreement, as grantors and guarantors.   True and correct copies of the Guaranty and Security Agreement and all amendments thereto are attached to the Original Petition, collectively, as Exhibit "C", and are incorporated herein for all purposes.

7. On or about May 23, 2019, to secure the Defendants' obligations to the Super Priority Agent and the Lenders under the Super Priority Credit Agreement and Super Priority Loan Documents, the Borrower and certain of the other Defendants, as grantors, and the Super Priority Agent executed and delivered that certain Guaranty and Security Agreement, dated as of May 22, 2019 (as amended or otherwise modified from time to time, the "Super Priority Guaranty and Security Agreement" and together with the Guaranty and Security Agreement, the "Guaranty and Security Agreements").   A true and correct copy of the Super Priority Guaranty and Security Agreement is attached to the Original Petition as Exhibit "D", and is incorporated herein for all purposes.

8. Pursuant to the terms and conditions of the Guaranty and Security Agreements, the Defendants each (i) absolutely, unconditionally and irrevocably guaranteed to the Agent, for the benefit of the itself and the Lenders, the payment of the indebtedness owing by the Borrower under the Credit Agreements, and (ii) to secure the repayment of such indebtedness and the performance of the their obligations under the Credit Agreements and the other Loan

Documents, granted to the Plaintiff, for the benefit of itself and the Lenders, a first-priority security interest in and lien on (subject only to Permitted Liens) the following assets of the Defendants (collectively, the "Personal Property Collateral²"):

      (a)     all of the Defendants' Accounts (as defined in the Uniform Commercial Code, hereafter the "UCC");

      (b)     all of the Defendants' Chattel Paper (as defined in the UCC), including electronic chattel paper;

      (c)     all of the Defendants' Commercial Tort Claims (as defined in the UCC);

      (d)     all of the Defendants' Deposit Accounts (as defined in the UCC);

      (e)     all of the Defendants' Documents (as defined in the UCC);

      (f)     all of the Defendants' General Intangibles (as defined in the UCC), including Payment Intangibles (as defined in the UCC), Software (as defined in the UCC) and Intellectual Property;

      (g)     all of the Defendants' Inventory (as defined in the UCC), Equipment (as defined in the UCC), fixtures and other Goods (as defined in the UCC);

      (h)     all of the Defendants' Instruments (as defined in the UCC);

      (i)     all of the Defendants' Investment Property (as defined in the UCC), including, but not limited to, such Defendant's Equity Interests (as defined in the Credit Agreement) in each Subsidiary;

      (j)     all of the Defendants' Letter-of-Credit Rights (as defined in the UCC);

      (k)     all of the Defendants' Supporting Obligations (as defined in the UCC);

      (l)     all of the Defendants' monies, whether or not in the possession or under the control of the Agent or a bailee or Affiliate of the Agent, including any cash Collateral;

      (m)     all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral;

---

² The Personal Property Collateral does not include the Excluded Collateral (as defined in the Guaranty and Security Agreements).

(n)     all of the Defendants' books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing (collectively, the "<u>Books and Records</u>");

(o)     all proceeds resulting from any Defendants' key-man policies; and

(p)     without limiting the generality of the foregoing, any and all of such Defendant's rights (but none of its obligations), title and interests (including security interests) under Permits and the Material Contracts.

## C.     THE PLEDGE AGREEMENTS AND COLLATERAL THEREUNDER

9.     On or about October 28, 2016, to secure the Defendants' obligations to the Administrative Agent and the Lenders under the Credit Agreement and Loan Documents, the Borrower and certain of the other Defendants, as grantors, and the Administrative Agent executed and delivered that certain Pledge Agreement, dated as of October 28, 2016 (as amended, supplemented, or otherwise modified from time to time, "<u>Pledge Agreement</u>"), as amended, modified and supplemented by (1) that certain Amendment No.1 to Pledge Agreement, dated January 7, 2019, (2) the Omnibus Agreement, (3) those certain Pledge Joinder Agreements, executed and delivered from time to time by the Defendants to join such Defendants as debtors (collectively, the "<u>Pledge Joinders</u>"), and (4) those certain Pledge Agreement Supplements executed and delivered by the Defendants from time to time (collectively, the "<u>Pledge Supplements</u>").  True and correct copies of the Pledge Agreement and all amendments thereto the Pledge Joinders and the Pledge Supplements are attached to the Original Petition, collectively, as <u>Exhibit "E"</u>, and are incorporated herein for all purposes.

10.     On or about May 23, 2019, to secure the Defendants' obligations to the Super Priority Agent and the Lenders under the Super Priority Credit Agreement and Super Priority Loan Documents, the Borrower and certain of the other Defendants, as grantors, and the Super Priority Agent executed and delivered that certain Pledge Agreement, dated as of May 22, 2019 (as amended or otherwise modified from time to time, the "<u>Super Priority Pledge Agreement</u>"

and together with the Pledge Agreement, the "Pledge Agreements". A true and correct copy of the Super Priority Pledge Agreement is attached to the Original Petition as Exhibit "F", and is incorporated herein for all purposes.

11.     Pursuant to the terms and conditions of the Pledge Agreements, to secure the repayment of the indebtedness and the performance of the obligations under the Credit Agreements and other Loan Documents, the Defendants granted to the Plaintiff, for the benefit of itself and the Lenders, a first-priority security interest in and lien on (subject only to Permitted Liens) the following assets of the Defendants (collectively, the "Pledged Equity Collateral[3]"):

(a)     (i) in the case of each Domestic Subsidiary, one hundred percent (100%) of the issued and outstanding Equity Interests of such Subsidiary and (ii) in the case of each First Tier Foreign Subsidiary and FSHCO that is directly owned by any Loan Party Debtor, sixty-five percent (65%) of the issued and outstanding Equity Interests of such Subsidiary entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and one hundred percent (100%) of the issued and outstanding Equity Interests of such Subsidiary not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)), whether now existing or hereafter created or acquired (collectively, the "Pledged Interests");

(b)     all money, securities, security entitlements and other investment property, dividends, distributions, rights, general intangibles and other property at any time and from time to time (i) declared or distributed in respect of or in exchange for or on conversion of any Pledged Interest, or (ii) by its or their terms exchangeable or exercisable for or convertible into any Pledged Interest (collectively, the "Equity Distribution Collateral");[4]

(c)     all other property of whatever character or description, including money, securities, security entitlements and other investment property, and general

---

[3] The Pledged Equity Collateral does not include the Excluded Pledged Collateral (as defined in the Guaranty and Security Agreements).

[4] Among the Equity Distribution Collateral, subject to the liens of the Agent, are the net profit distributions generated by certain affiliates of the Defendants (including, but not limited to, distributions from Elite Sinus Spine and Ortho, LLC, Houston Metro Ortho and Spine Surgery Center, LLC, Elite Center for Minimally Invasive Surgery, LLC, and Elite Hospital Management, LLC (collectively, the "Elite Entities") to Northstar Healthcare Surgery Center - Houston, LLC (the "Elite Entity Parent"), and any distributions made by the Elite Entity Parent to the Borrower (the "Elite Equity Distribution Collateral"). Nothing herein shall constitute the appointment of a receiver for the Elite Entities or the Elite Entity Parent or the assets of the Elite Entities or the Elite Parent Entity. By this Receivership Order, the Receiver is vested with the full right, title and authority, as described below, to receive (i) cash distributions made to the Borrower from the Elite Entity Parent, and (ii) thereafter remit such amounts to the Agent pursuant to the terms of this Receivership Order.

intangibles hereafter delivered to the Agent in substitution for or as an addition to any of the foregoing;

(d)      all securities accounts to which any or all of the foregoing may at any time be credited and all certificates and instruments representing or evidencing any of the foregoing; and

(e)      whatever is receivable or received when any of the foregoing or the proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including, without limitation, all rights to payment, and all rights to payment with respect to any claim or cause of action affecting or relating to any of the foregoing.

**D.    THE IP SECURITY AGREEMENTS AND COLLATERAL THEREUNDER**

12.    On or about October 28, 2016, to secure the repayment of the indebtedness and the performance of the obligations under the Credit Agreement and related Loan Documents, the Borrower and the Defendant Nobilis Health Corp., as grantors, and the Administrative Agent executed and delivered that certain Intellectual Property Security Agreement, dated as of October 28, 2016 (as amended, supplemented, or otherwise modified from time to time, "IP Security Agreement"). A true and correct copy of the IP Security Agreement is attached to the Original Petition as Exhibit "G", and is incorporated herein for all purposes.

13.    On or about May 23, 2019, to secure the repayment of the indebtedness and the performance of the obligations under the Super Priority Credit Agreements and other Super Priority Loan Documents, the Borrower and the Defendant Nobilis Health Corp., as grantors, and the Super Priority Agent executed and delivered that certain Intellectual Property Security Agreement, dated as of May 22, 2019 (as amended or otherwise modified from time to time, the "Super Priority IP Security Agreement" and together with the IP Security Agreement, the "IP Security Agreements". A true and correct copy of the Super Priority IP Security Agreement is attached to the Original Petition as Exhibit "H", and is incorporated herein for all purposes.

14.    Pursuant to the terms and conditions of the IP Security Agreements, to secure the

repayment of the Indebtedness and the performance of the obligations under the Credit Agreements and other Loan Documents, the Defendants party thereto granted to the Plaintiff, for the benefit of itself and the Lenders, a first-priority security interest in their Intellectual Property.

15.    Hereafter, the IP Collateral, the Personal Property Collateral and the Pledged Equity Collateral together with all Equity Distribution Collateral and the cash or non-cash proceeds of all of the foregoing, shall be collectively referred to as the "Collateral".

**E.    SECURITY INTERESTS PERFECTED**

16.    The Plaintiff, as the Agent, properly perfected its first-priority security interests in and liens on (subject only to Permitted Liens) the Collateral by: (a) filing UCC-1 financing statements naming each of the Defendants, as debtor, and the Plaintiff, as agent, as secured party, with the Secretary of State's office of each Defendant's jurisdiction of organization (as amended and continued, collectively, the "Financing Statements"), (b) executing and delivering deposit account control agreements executed and delivered by the applicable Defendant, the applicable depository bank, and the Agent (collectively, the "Deposit Account Control Agreements"), (c) the execution and delivery by certain of the Defendants, the Administrative Agent and the other parties thereto of that certain Control Agreement, dated February 1, 2017 (the "Pledged Interests Control Agreement"), wherein the Agent obtained control of the Pledged Interests of each Defendant signatory thereto, (d) the recordation of the IP Security Agreements with the United States Patent and Trademark Office (the "IP Recordations"), (v) the Agent's possession of original share certificates issued by the Borrower, the Defendant Northstar Healthcare Holdings, Inc., and the Defendant Northstar Healthcare Subco, L.L.C. and original executed stock powers in respect of the same (collectively the "Share Certificates and Stock Powers"). True and correct copies of all of the Financing Statements, Deposit Account Control Agreements, Pledged Interests Control Agreements, IP Recordations, and Share Certificates and Stock Powers are

attached to the Original Petition, collectively, as Exhibit "I" and are incorporated herein for all purposes. The Financing Statements and the Deposit Account Control Agreements each more fully describe the Collateral.

17. A significant portion of the Collateral pledged to the Agent to secure the repayment of the Indebtedness in excess of $140 million consists of accounts receivable owed directly to the Defendants (or generated by certain partially owned affiliates of the Defendants that are required to make periodic net profit distributions to their members, including certain of the Defendants or their wholly-owned affiliates) by insurance payors in respect of facility fees on account of services rendered at facilities owned or operated the Defendants or their affiliates and fees for physician services provided at such facilities (collectively, the "Accounts Receivable").

**F.     EVENTS OF DEFAULT UNDER THE CREDIT AGREEMENTS AND THE OTHER LOAN DOCUMENTS HAVE OCCURRED AND CONTINUED PRIOR TO THE SEPTEMBER 24, 2019 ACCELERATION OF THE INDEBTEDNESS UNDER THE CREDIT AGREEMENT**

18. There is evidence that multiple Events of Default under the Credit Agreements and the other Loan Documents have occurred and are continuing due to, among other things, each of the following: (i) the Defendants' failure to comply with multiple financial covenants in the Credit Agreements and other Loan Documents, (ii) the Defendants' failure to comply with the negative covenant on restricted payments in the Credit Agreement, (iii) the Defendants' failure to make multiple interest and principal payments under the Credit Agreement when due, (iv) the Defendants' repeated failure to close a "Sale or Refinancing" in accordance with the requirements of the Loan Documents, (v) the Defendants' failures to provide numerous budgets and other deliverables as required pursuant to the terms of the Loan Documents, and (vi) the Defendants' failures to repay the indebtedness under the Credit Agreements and other Loan Documents, including the Guaranty and Security Agreements, when such indebtedness became due.

19.     The Plaintiff has given the Defendants notice of the Events of Default described in the preceding paragraphs.  Notwithstanding such notices of the Events of Default, the Events of Default described in the preceding paragraphs remain uncured.  As a consequence of the continuation of the Events of Default, the Plaintiff accelerated the due date of the indebtedness owing by the Defendants to the Plaintiff and the Lenders under the Credit Agreement. Additionally, all indebtedness pursuant to the Super Priority Credit Agreement became due and payable on the August 30, 2019 maturity date thereof.

20.     Based on the evidence before the Court, such Events of Default remain in existence, and have yet to be cured, and the Defendants have acknowledged the occurrence and continued existence of these Events of Default pursuant to the Limited Waivers and the Forbearance Agreements.

## G.     THE FORBEARANCE AGREEMENTS

21.     The loans have been in workout for over 11 months, with the Agent and the Lenders agreeing to numerous waivers (collectively, the "Limited Waivers") and forbearances (collectively, the "Forbearance Agreements"), with (i) commitments by the Defendants to sell their assets or otherwise refinance the Indebtedness by certain deadlines (which deadlines the Defendants repeatedly failed to meet, even after numerous extensions), (ii) acknowledgements from the Defendants that certain events of default had occurred and were continuing, and (iii) full releases by the Defendants in favor of the Agent and the Lenders.  Unfortunately, such efforts to effect a "Sale or Refinancing" were unsuccessful by the Defendants, their Chief Restructuring Officer, and their financial advisor/investment banker. True and correct copies of each Limited Waivers are attached to the Original Petition, collectively, as Exhibit "J", and are incorporated herein for all purposes.

22.     As a result of the foregoing Events of Default and the termination of the

forbearance periods under the Forbearance Agreements on or before August 30, 2019, as a result of the expiration of such forbearance periods and/or the occurrence and continuation of certain Events of Default described herein which earlier terminated such forbearance periods, the Plaintiff on behalf of itself and the Lenders properly accelerated all of the Indebtedness (other than indebtedness that under the Super Priority Credit Agreement had already matured and become due and payable under its terms), made demand for payment of the Indebtedness to the Defendants and informed the Defendants that the Agent intended to exercise all of its rights and remedies under the Credit Agreements and the Loan Documents, including seeking the appointment of a receiver, pursuant to a Notice Letter delivered to the Defendants (the "September 24, 2019 Notice Letter"). A true and correct copy of the September 24, 2019 Notice Letter is attached to the Original Petition as Exhibit "K", and is incorporated herein for all purposes.

23.     Thus, prior to the filing of the Original Petition, (i) the indebtedness under the Super Priority Credit Agreement was due and payable, as the maturity date of August 30, 2019 has passed, and (ii) the indebtedness under the Credit Agreement was due and payable following the Plaintiff's acceleration of the indebtedness and other obligations owing by the Defendants under the Credit Agreement and the related Loan Documents.

### H.    FACTS SUPPORTING APPOINTMENT OF A RECEIVER

24.     Recognizing that the Defendants needed additional liquidity and "runway" to close a Sale or Refinancing, on May 23, 2019, the Agent and certain of the Lenders provided an additional $7.75 million loan under a "super-priority" credit facility secured on a senior basis to obligations under the initial Credit Agreement and related Loan Documents.

25.     The Defendants were unable to close on a Sale or Refinancing, even on a heavily discounted basis, to satisfy the Indebtedness owing to the Agent and the Lenders. Further, the

Defendants have remained cash flow negative at most of their facilities with dwindling cash to meet their obligations. Accordingly, on or about September 6, 2019, the Chief Restructuring Officer elected to begin the process of winding-down substantially all of the remaining operations of the Defendants at most of their remaining facilities and substantially further reduce employee headcount. As of the filing of the Original Petition, the remaining assets of the Defendants (all of which constitute the Collateral of the Agent) consist primarily of the following: (i) the Accounts Receivable, (ii) the Equipment, (iii) the Inventory, (iv) the cash, (v) the Pledged Equity Collateral and any associated rights to receive distributions in respect thereof, and (vi) all cash and non-cash proceeds of any of the foregoing (collectively, the "Remaining Collateral").

26.     Given that the Defendants have very limited funds and have no ready source of additional funds to cover the Defendants' payroll, lease, infrastructure, and other expenses of operations, there is a very grave risk of loss in value to the Remaining Collateral. A core group of employees of the Defendants is necessary to assist in the collection and monetization of the Remaining Collateral and without their continued employment under the supervision of a receiver, there is a grave danger that there will be a significant loss in the value of the Remaining Collateral. It is important to note that the Defendants have been unable to attract new capital and as a consequence, the Defendants have been in a wind-down mode for months now, save and except for "core assets", with many employees and senior executives having already departed the Defendants, and as noted above even most of the "core asset" facilities have been closed or will be closed. Based on the evidence before the Court, as of the filing of the Original Petition, the Plaintiff and the Lenders are owed by the Defendants, jointly and severally, in excess of $140 million in principal, interest and other fees, pursuant to the terms of Credit Agreements and other

Loan Documents, which Indebtedness is secured by first-priority security interests in (subject only to Permitted Liens) all of the Collateral, including all Remaining Collateral, and the Defendants have received no further financial commitments from third parties to support any wind-down.

27.   Given the foregoing, the Defendants have little, if any, ability to raise additional cash to satisfy the Indebtedness, in excess of $140 million, owed by the Defendants to the Plaintiff and the Lenders, and do not have available cash required to manage, dispose of and monetize, or otherwise protect the Collateral.   Accordingly, the Plaintiff has a legitimate and substantial concern that its Collateral, including the Remaining Collateral, is in imminent danger of being wasted, diminished in value, and materially injured.   It is within this context, with the Plaintiff and the Lenders being owed, as of September 1, 2019, Indebtedness in excess of $140 million, secured by first-priority liens on (subject only to Permitted Liens) all of the Defendants' personal and real property assets (all of which constitutes the Defendants' business assets), that the Plaintiff seeks the relief requested herein.

28.   Due to the circumstances more fully described above, immediate and irreparable injury, loss, and/or damage could result to the Plaintiff by virtue of the diminution in the value of, the loss or waste of the Collateral, especially given that the Remaining Collateral requires ongoing efforts to collect, monetize, and otherwise maintain the same.

29.   To avoid the loss to the Plaintiff, the appointment a temporary receiver immediately to take control of the Collateral, with the ability to subsequently dispose of same in accordance with the directions of the Plaintiff in accordance with the terms and conditions of this Order is necessary.   In the absence of the appointment of a temporary receiver for the Collateral, the Plaintiff will suffer irreparable harm inasmuch as the Collateral is the only known, available,

and realistic source of repayment of the Indebtedness, in excess of $140 million, owed by the Defendants to the Plaintiff and the Lenders.  To the extent that such Collateral is not properly collected or is otherwise seized by landlords or judgment lien creditors, the Plaintiff will suffer irreparable harm if the Court does not immediately order the appointment of a temporary receiver.

30.     There are numerous continuing Events of Default under the Credit Agreements and other Loan Documents as set forth herein, and Section 7.4 of the Guaranty and Security Agreements expressly states in relevant part that upon the occurrence and during the continuation of an Event of Default:

> "[Plaintiff] shall be entitled to appointment of a receiver to take possession of and to manage all or any portion of the Collateral. [Plaintiff] may obtain such appointment without notice to, or demand of any [Defendant], on an ex parte basis before any court of competent jurisdiction, and without regard to the adequacy of the Collateral as security for the [Indebtedness]."

31.     There is a reasonable likelihood that, absent the appointment of a receiver, the Collateral will be dissipated or decline in value due to the excessive cost of the Defendants' continuing operations that are not essential to the collection and monetization of the Remaining Collateral and the imminent loss of personnel required for a successful transition of the collection and monetization of the Remaining Collateral and processing or related claims.

32.     The Defendants are in financial distress and have been in financial distress for quite some time.  Not only are the Defendants in default under the Credit Agreements and the other Loan Documents, but pursuant to the evidence before the Court, the Defendants have numerous other financial obstacles as summarized below:

a.     The Defendants have been unsuccessful in raising new capital either from a sale of their assets or the refinancing of the Indebtedness;

b.    As a result of the numerous ongoing Events of Default, the Plaintiff and the Lenders have <u>no</u> obligation to advance any funds to the Borrower or the other Defendants;

c.    The Defendants' business plan was premised upon the successful acquisition of physician groups and facilities and the organic growth of physician relationships.  Further, the business plan contemplated that these acquisitions and physician relationship growth would result in profitable facilities, synergies, cost-savings, and explosive growth.  However, many of the acquisitions proved to be unprofitable and insurance payors increasingly denied or delayed payments on claims, creating substantial financial stress on the Defendants and ultimately resulting in Events of Default under the Credit Agreements and Loan Documents;

d.    Immediate operating losses and cash burn from these acquisitions led to divestitures and the shut down of many facilities;

e.    There has been continued uncertainty regarding the Defendants' evolving business plan strategy in 2019, including continued uncertainty surrounding its plans to transition from being primarily out-of-network to becoming primarily in-network with insurance payors;

f.    The Defendants have been slow to right-size their corporate overhead structure to coincide with the downsized facility profile that resulted from the divestitures and shut down of facility operations;

g.    The Defendants have <u>no</u> present ability to pay the current corporate overhead or costs of collecting or monetizing the Remaining Collateral;

h.    The Plaintiff has been advised that the Defendants have <u>no</u> financial wherewithal to pay the current corporate overhead or costs of collecting or supervising the collection and monetization of the Accounts Receivable and processing related claims, in the absence of continued funding by the Plaintiff and the Lenders, which the Plaintiff and the Lenders have no further interest in funding, nor any obligation to fund;

i.    The Defendants' projected corporate operating expenses and debt service are in excess of the Defendants' projected and realistic business revenues; moreover, given the significant deterioration of the profitability of the Defendants' operations, the Defendants simply have not and cannot rationalize the size of their operations to adjust to such net revenues derived therefrom;

j.    The Plaintiff understands that the Defendants do <u>not</u> have the financial wherewithal to pay their other creditors, including lessors, which may result in certain judgment creditor actions seeking to levy upon the very assets constituting the Collateral of the Plaintiff and lessors locking the Defendants out of their facilities;

k.   The Defendants have been unable to produce reliable projections of revenues from continuing operations on which any lender could reasonably expect repayment of any additional amount advanced by such a lender;

l.   There are grossly inadequate funds to pay the employees of the Defendants, in the absence of the Plaintiff and the Lenders making advances (which under the Credit Agreements and other Loan Documents, they have no obligation to do). There is a real threat that the employees responsible for collecting and monetizing the Remaining Collateral and processing claims are likely to leave the Defendants' employment, resulting in a real threat to the collection and monetization of the Collateral;

m.   Since the beginning of September 2019, the Chief Legal Officer, the Chief Financial Officer, and the President of the Defendants have each resigned; and

n.   The Defendants have inadequate available funds of their own to pay certain of their employees who are familiar with the Defendants' Books and Records—and accounts receivable. Accordingly, there is a threat to the Collateral of the Plaintiff unless it is able to obtain the relief sought herein, with a receiver obtaining authority to retain certain key employees of the Defendants necessary to assist in the collection and monetization of the outstanding Accounts Receivable and other Remaining Collateral or assist in the transition of managing the collection and monetization of the Accounts Receivable and other Remaining Collateral to a third party.

33.   Given the foregoing, the Defendants have little to no ability to raise additional cash to satisfy the approximate $140 million indebtedness owed by the Defendants, to the extent such Defendants are liable for the same under the Loan Documents, to the Plaintiff and the Lenders.   Given the Defendants' inability to raise additional funds, and the Defendants' excessive costs of maintaining their corporate offices, corporate overhead and related infrastructure, there is imminent risk that the Defendants will fail to maintain, preserve, and protect the Collateral.   Accordingly, the Collateral is in danger of being dissipated and diminished in value.

34.   In accordance with the terms of the Credit Agreements and the other Loan Documents, the Plaintiff has the right to enforce its State and Uniform Commercial Code Article 9 law rights, and through the relief sought by the Plaintiff in the Original Petition, the Plaintiff

seeks to have a receiver appointed to take possession of the Collateral, and to protect, preserve, collect and monetize the Collateral including the Accounts Receivable.  The substantial risk to the Collateral posed in the absence of appointment of a temporary receiver substantially outweighs any potential harm to the Defendants.

## II.   ORDER APPOINTING RECEIVER

IT IS, THEREFORE, ORDERED, that effective on September 24, 2019:

A.   Howard Marc Spector, a Texas resident who possesses the necessary qualifications and is not an attorney for or related to any party in this action, be and hereby is appointed the Receiver (the "Receiver") for the Defendants' assets, at all of the Defendants' business locations,[5] and all the Defendants' property, personal and leasehold, tangible and intangible, of whatever kind and description, wherever situated, including the Defendants' assets located in Arizona (collectively, the "Other Jurisdictions"), where such assets may be in the possession of third parties but are the property of the Defendants (collectively, the "Receivership Assets"), and all proceeds from the Receivership Assets of the Defendants (collectively, the "Receivership Proceeds").

B.   The Receiver shall file with the Clerk of this Court a bond in the amount of $2,500, either in cash, by firm check, or with sureties approved by the Court, conditioned that he will well and truly perform the duties of his office and duly account for all monies and properties which may come into his hands and abide by and perform all things which he shall be directed to do.

C.   Given the substantial risk to the Plaintiff's Collateral in the absence of a temporary restraining order and preliminary injunction and the comparatively insignificant harm to

---

[5] A true and correct copy of all of the locations where the Defendants have or are conducting business, and the situs of the Inventory, Equipment, and Books and Records are at the locations listed on Exhibit "A" hereto, which is incorporated herein for all purposes.

the Defendants from the entry of such restraints and the appointment of the Receiver, the Plaintiff shall file with the Clerk of this Court a bond in the amount of $500.00, either in cash, by firm check, or with sureties approved by the Court, to secure the payment to the Defendants of all damages and costs in this suit in case it should be decided that such Receiver was wrongfully appointed to take charge of the assets of the Defendants.

D.    Until further order of this Court, the Receiver is hereby authorized forthwith to take any actions necessary to the proper and lawful conduct of the Defendants, including the following:

1.    Take any actions necessary to take complete and exclusive control, possession and/or custody, to the extent applicable or to the extent the Receiver deems necessary, of the Collateral, and of any proceeds thereof, to the extent necessary to protect the Collateral and to subject it to the Plaintiff's secured claims;

2.    Take possession of, preserve, insure, protect, manage, sell and otherwise monetize, and/or supervise the collection and monetization of all the Receivership Assets, in whole or in part, whether in the ordinary course or otherwise, by bulk sale, auction sale, or use of a broker, in each case as determined by the Receiver, subject to the consent of the Plaintiff and separate order of this Court approving any such sales, or otherwise by contract with respect to all or a portion thereof, including, but not limited to, (a) allowing the Plaintiff and its agents, employees, representatives, and/or independent contractors to inspect the Receivership Assets, collect, enforce, supervise the collection and monetization of, the Collateral and prepare the same for sale or foreclosure, and (b) employing crisis managers (as determined necessary by the Receiver), employees, brokers, auctioneers, appraisers, advisors, agents, collections clerks, outside accountants, attorneys, and other suppliers of goods and services and paying for them at ordinary and usual rates from the Receivership Assets and Receivership Proceeds; and (c) maintain, insure, assemble, and protect the Receivership Assets;

3.    Except to the extent that such instruments are already in the possession and control of the Plaintiff, take and maintain control, possession, and/or custody of all instruments, and other assets constituting Collateral, in each case, with the Receiver maintaining control, possession and/or custody, to the extent the Receiver deems necessary, of the Books and Records of the Defendants necessary to facilitate the maintenance, preservation, management, collection and realization of the Collateral;

4.    Close any and all sale agreements, executed by the Defendants prior to the appointment of the Receiver hereunder, if any, to the extent approved by the Plaintiff, and to execute and deliver any and all documents in connection with same, in the name of the Defendants, with such power of attorney as provided herein;

5.     Maintain access to and control of each of the Defendants' existing deposit accounts, which are subject to the Deposit Account Control Agreements, for the collection of the net cash proceeds from the Collateral, with the full power of the Plaintiff to sweep the funds in such deposit accounts, as determined by the Plaintiff, and apply the same against the Indebtedness, in excess of $140 million, owing by the Defendants to the Plaintiff under the Credit Agreements and the other Loan Documents;

6.     Engage independent contractors and other collection agencies or advisors, necessary or appropriate for the management, supervision of collection, maintenance, collection, monetization or enforcement of the Collateral, wherever located, subject to this Order, applicable law, and the consent of the Plaintiff, with the power to terminate, modify and amend existing agreements concerning the Collateral and/or execute and deliver new agreements in substitution therefor;

7.     Take possession of, or obtain access to, the Books and Records of the Defendants, to the extent related to the Defendants or the Collateral on a continuing basis;

8.     Remit to the Plaintiff, to be applied to the repayment of the Indebtedness, in excess of $140 million, under the Credit Agreements and other Loan Documents, the proceeds of the Collateral net of any necessary operating expenses;

9.     Collect, monetize, settle, compromise, and otherwise enforce all Accounts Receivable and other Collateral currently owing to any of the Defendants or generated in the future and owing to any of the Defendants (including causing the distribution of net profits from Collateral (including Accounts Receivable) generated at affiliates of the Defendants to the extent the Defendants are entitled to cause the same), including filing suits for collection against insurance payors and patients, all subject to the terms of this Order and the consent of the Plaintiff, and applying the proceeds thereof in accordance with the terms of this Order;

10.     Funding the cost necessary to collect and monetize the Collateral, as may be agreed upon by the Receiver and the Plaintiff, and as more fully set forth in an approved budget agreed to by the Plaintiff and the Receiver (the "Approved Budget").

11.     Alter the place of payment and the method of collection of the Accounts Receivable or other amounts due the Defendants where required to ensure proper application of such payments and collections;

12.     Communicate with any person or entity and obtain information and documents necessary or useful for the collection or monetization of the Collateral;

13.     Provide reports to the Plaintiff detailing the Receiver's disbursements for paying the costs incidental to the receivership activities hereunder, with such disbursements pursuant to the Approved Budget, and describing the Receiver's activities and the financial and operational status of the Defendants;

14.     Exercise the full authority, with power of attorney on behalf of and in the

name of the Defendants, to:

a.     subject to approval of each disposition by the Plaintiff, execute and deliver any and all of the documents, including, but not limited to, brokers' or advisors' retention agreements, auction agreements, purchase and sale agreements, deeds of conveyance, closing statements, settlement statements, and any other documents necessary or helpful to the performance of the Receiver's duties as more fully set forth herein;

b.     sign on behalf of the Defendants any such documents;

c.     sign on behalf of the Defendants any invoices, or notices to insurance payors or other obligors in respect of Accounts Receivable or contracts necessary or helpful to the performance of his activities provided for herein;

d.     cause affiliates to direct their affiliates to take actions deemed appropriate by the Receiver, as agreed by the Plaintiff,

e.     endorse on behalf of any the Defendant any negotiable collateral that may come into the possession or control of the Receiver;

f.     initiate, defend, make, settle, and/or adjust all claims under the Defendants' policies of insurance and make all determinations and decisions with respect to such policies of insurance, and notify any and all insurers under any such policies of insurance that any proceeds paid thereunder shall be paid to the Receiver until such time as such insurance carriers are advised to the contrary by this Court or until such insurance carriers receive a certificate issued by the Clerk of this Court evidencing a dismissal of this action;

g.     institute, defend, settle and/or adjust disputes and claims respecting the Receivership Assets, for amounts and upon terms that the Receiver determines to be reasonable, subject to the Plaintiff's consent;

h.     obtain, review and analyze any past records, including, without limitation, accounting records, disbursements, banking records, claims processing records, and any other Books and Records necessary to determine whether there are any potential claims or rights against the other persons and entities arising out of the ownership and operation of the Collateral;

i.     continue, subject to the Receiver's determination to shut down or sell the operations of any Defendant, to utilize and maintain all existing licenses and permits in connection with any Defendant's business and continue any operation or activity of any Defendant currently authorized by any licenses, permits, or entitlements or currently permitted to take place at the any Defendant's business location, subject to compliance by the Receiver

with the terms of any and all licenses or permits necessary for the performance thereof;

j.  pay prior obligations incurred by the Defendants, by their agents, officers, directors, partners, managers, and servants, or any other person or entity charged with the responsibility of maintaining and operating the Receivership Assets, if such obligations are deemed by the Receiver to be necessary or advisable, subject to the Approved Budget; and

k.  cause to be executed and delivered any documents and releases that Receiver determines to be necessary, and at all times, subject to the consent of the Plaintiff and consistent with the terms of this Order. The appointment of the Receiver as the Defendants' attorney-in-fact with respect to the Receivership Assets and Receivership Proceeds, and each and every one of his rights and powers, being coupled with an interest, is irrevocable until the receivership is discharged by this Court;

15.  Exercise the full authority, as attorney-in-fact, on behalf of and in the name of the Defendants, to:

a.  take any and all actions that may be required or desirable to preserve, renew and maintain the legal existence and good standing for the Defendants, as applicable, in Texas or Arizona and in other jurisdictions where they conduct business, including, but not limited to, retaining professionals to assist in the filing of any and all reports with such jurisdictions;

b.  take any and all actions that may be required or incidental to preserve, renew and maintain the qualification and authority to do business and good standing in each other jurisdiction where it is necessary or desirable for the Defendants to conduct business, including, but not limited to, retaining professionals to assist in the filing of any and all reports with each applicable jurisdiction, and paying applicable franchise taxes with respect thereto;

c.  take any and all actions that may be required or desirable to obtain and maintain any and all licenses and other appropriate regulatory approvals to permit the Defendants to operate, as applicable, in the State of Texas and the State of Arizona (and in any other applicable jurisdictions where it is necessary or desirable for the Defendants), including, but not limited to, retaining professionals to assist in the filing of any and all documents with the applicable regulatory authorities, and paying any applicable fees or charges with respect thereto, and obtaining, renewing and maintaining any and all fidelity bonds or other bonds that may be required or desirable;

d.    execute and deliver any and all documents, reports, or other forms in furtherance of the Receiver's responsibilities herein; and

e.    engage in all actions reasonable or necessary to accomplish the foregoing responsibilities, in each case subject to the written consent of the Plaintiff;

16.    To receive (i) cash distributions made to the Borrower from the Elite Entity Parent, and (ii) thereafter remit such amounts to the Agent pursuant to the terms of this Receivership Order;

17.    Request "protective advances" from the Plaintiff, at the Plaintiff's option, pursuant to the Super Priority Credit Agreement and related Super Priority Loan Documents, in order to pay the various costs necessary to maintain, protect, and insure the Receivership Assets, or to otherwise effect the disposition and monetization of the Receivership Assets, consistent with the Approved Budget, with all such distributions constituting Indebtedness owing to the Plaintiff and the Lenders under the Super Priority Credit Agreement, with the Receiver obligated to repay such distributions from the proceeds of the Receivership Assets;

18.    Incur the risks and obligations ordinarily incurred by owners, managers, and operators of similar businesses and enterprises, and no such risk or obligation so incurred shall be the personal risk or obligation of the Receiver, but rather a risk or obligation of the Defendants;

19.    (a) Except as to deposits in the possession and control of the Plaintiff, take possession of and receive any money on deposit from any banks with which any Defendant maintains accounts, and upon the receipt by the Receiver of said funds, to discharge any bank from further responsibility for accounting to such Defendant for funds which the Receiver has taken; and (b) issue demands for the freezing and turnover of funds upon any financial institution which the Receiver has determined is in possession of funds arising from, or constituting proceeds of, the Collateral;

20.    Delete the authorized signatories on any account of the Defendants and replace the same with the name of the Receiver or his designee;

21.    Take possession of all Books and Records (including copies of all records or documents on electronic media and in computer memory) relating to the Collateral wherever located; provided, however, nothing contained in this Order shall result in a waiver of any attorney privilege held by any of the Defendants or entitle the Receiver or the Plaintiff to possession or control of any documents or records containing such privileged communications, except to the limited extent that the privileged communications relate exclusively to the collection or monetization of Collateral or potential defenses thereto; further, documents that are subject to common interest privilege of the Plaintiff and the Defendants shall be shared with the Receiver, subject to maintaining such common interest privilege.

22.    To the extent necessary or helpful to the preservation, marketability, sale or other disposition of the Collateral, have the full authority to apply for, obtain, renew,

and, as necessary, prevent the loss of all trademarks, copyrights, patents, licenses, permits and entitlements required for the preservation or operation of the Receivership Assets, or issued in connection therewith;

23.     Direct the activities of any crisis manager or independent contractors (including the former employees and independent contractors of the Defendants) employed to assist the Receiver in handling the affairs relating in any way to the Collateral, subject to the Plaintiff's consent;

24.     Defend, compromise and adjust such actions or proceedings in state or federal courts now pending and hereafter instituted, as may in his sole discretion be advisable or proper for the protection of the Collateral, and investigate, institute, prosecute, compromise and adjust actions in state or federal court as may in his sole discretion be advisable or proper to recover Collateral improperly or unlawfully held by any person, including, but not limited to, the Defendants;

25.     Collect all amounts due and owing to the Defendants, and deposit the proceeds thereof, together with any other funds from any other sources relating to or arising out of the Collateral, into such Plaintiff-controlled deposit accounts, for payment of the Indebtedness, in excess of $140 million, pursuant to the terms and conditions of the Credit Agreements and the other Loan Documents;

26.     Use the Collateral, and all proceeds thereof, to service, collect, monetize and preserve the Collateral, subject to the Plaintiff's consent and the Approved Budget, in each case, until such time as the Plaintiff has been paid in full the Indebtedness, in excess of $140 million, owed by the Defendants pursuant to the Credit Agreements and other Loan Documents, including, but not limited to, the Receiver's reasonable fees and expenses, and the Plaintiff's reasonable attorneys' fees, costs and expenses; and

27.     Collect and process all inbound mail addressed to any Post Office Box owned or controlled by any Defendant (or any of its managers acting on behalf of any Defendant) if the mail is addressed to any Defendant.

E.     Any money coming into the possession of the Receiver and not expended for any of the purposes authorized herein shall be turned over by the Receiver to the Plaintiff for application against the then-outstanding Indebtedness, currently in excess of $140 million, owed by the Defendants to the Plaintiff and the Lenders, subject to disgorgement as may be ordered by further order of this Court pursuant to a final, no longer appealable judgment.

F.    Nothing herein shall prevent the Plaintiff and the Receiver from seeking, or the Defendants from opposing, entry of a subsequent Order of this Court, after notice to the Defendants, providing for the Receiver to be exclusively vested with all the powers of officers, directors, and/or managers (as applicable) of the Defendants (including but not limited to the power to seek protection for the Defendants under the United States Bankruptcy Code), to the extent deemed necessary by the Receiver after consultation with the Plaintiff.

G.    The Receiver shall have no liability to any party, unless the Receiver has engaged in willful misconduct, fraud, gross negligence, or conversion.  Subject to the foregoing, any debts, liabilities, or obligations incurred by the Receiver in the course of this receivership, including the operation or management of the Receivership Assets, whether in the name of the Receiver, the Receivership Assets, the Receivership Proceeds, or the receivership estates, shall be the debt, liability, and obligation of the receivership estate only and not of the Receiver or any employee or agent thereof personally.  All who are acting, or have acted, on behalf of the Receiver at the request of the Receiver, are protected and privileged with the same protections of this Court as the Receiver enjoys.

H.    To the extent that there is any disagreement arising between the Receiver and the Plaintiff or the Defendants in connection with the matters relating to this receivership, this Court shall have jurisdiction to resolve such disputes.  Further, to the extent that the Plaintiff has agreed to the Receiver's fees and expenses, as set forth in the Approved Budget, and thereafter the Plaintiff fails to remit such payment to the Receiver, the Receiver may assert a claim for payment against the Receivership Assets, or the proceeds thereof.

I.     The Defendants, and their officers, directors, partners, managers, agents, servants, employees, representatives, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, shall deliver to the Receiver any and all Receivership Assets and Receivership Proceeds in the possession or under the control of any one or more of them.

J.     All persons, including materialmen and vendors, lessors, management companies, creditors, banks, investors, or others, with actual notice of this Order, are enjoined from in any way disturbing the Receivership Assets or Receivership Proceeds and from prosecuting any actions or proceedings designed to collect their debts or which involve the Receiver or which affect the property of the Defendants, to the extent that the same would injure the Collateral or interfere or disturb these receivership proceedings, without the permission of this Court; provided, however, nothing herein shall preclude the Plaintiff from exercising its rights and remedies under the Credit Agreements and the other Loan Documents, including but not limited to, foreclosing on the Collateral; provided, further, nothing herein shall preclude any party with standing to seek to modify the immediately preceding injunctive relief granted by this Court, after notice and a hearing. Any such actions in violation of the preceding statements in this Paragraph shall be null and void.

K.     The Receiver is hereby authorized to defend, compromise and adjust such actions or proceedings in state or federal courts now pending and hereafter instituted, as may in his sole discretion be advisable or proper for the protection of the Receivership Assets or Receivership Proceeds; and to investigate, institute, prosecute, compromise and adjust actions in state or federal court as may in his sole discretion be advisable or proper to

recover Receivership Assets or Receivership Proceeds improperly or unlawfully held by any person, including but not limited to the Defendants herein; and in that connection the Receiver is hereby indemnified and held harmless by the Receivership estate, to the extent of any equity in the Receivership Assets and Receivership Proceeds, after the payment of the Plaintiff's and the secured claim, for any judgment, costs, or expenses suffered or incurred by him or any of his agents or attorneys as a result of actions instituted against him or them in relation to the discharge of their duties aforesaid or in carrying out or furtherance of this Order; provided, however, that nothing herein shall be construed to indemnify the Receiver to the extent that such judgment, costs, or expenses arise from the gross negligence, willful misconduct, or fraud of the Receiver or any of his agents or attorneys.

L.   It is the intent of the Court that this Order apply directly and indirectly to all Receivership Assets and to all Receivership Proceeds.

M.   The Receiver shall make available to the Plaintiff and to Defendants' in-house counsel, Drake Genna, for inspection and copying, any and all Books and Records of the Defendants relating to the Receivership Assets, now or hereafter in existence.

N.   The Receiver shall keep the Plaintiff and the Defendants' in-house counsel, Drake Genna, apprised at reasonable intervals of all information and developments concerning the operation of the Receivership, until the Receivership is terminated.

O.   The Receiver shall seek and obtain from the Plaintiff the approval of any professional fees and expenses payable to the Receiver or the Receiver's counsel and any other professionals employed by or on behalf of the Receiver.  The Receiver may seek such

approval upon the presentation of a list of fees and/or expenses in any report delivered to the Plaintiff; and

**IT IS FURTHER ORDERED** that nothing herein shall preclude the Receiver or the Plaintiff from seeking or any Defendant from opposing writs of attachment and an order for turnover of the Collateral, to the extent that any persons or entities (including, but not limited to, financial institutions, title companies, escrow agents or others whom the Receiver has determined is in possession of funds arising from or constituting proceeds of the Collateral) shall not turn over such Collateral, together with any cash proceeds thereof, immediately upon (i) receipt of this Order with its injunctive relief set forth herein, and (ii) such demand for turnover by the Receiver; and

**IT IS FURTHER ORDERED** that this Court assumes jurisdiction over and takes possession of the assets, real and personal, tangible and intangible, of whatever kind and description, wherever located, which constitute the Receivership Assets or the Receivership Proceeds; and

**IT IS FURTHER ORDERED** that each officer, manager, partner, managing member, and/or director of any Defendant who wishes to resign from such Defendant shall provide prior notice to the Receiver of his or her intention to resign his or her position, together with the effective date of such party's resignation; and

**IT IS FURTHER ORDERED** that all former, present, and future officers, directors, managers, partners, agents, representatives, directors, and employees of any Defendant shall not hinder, delay, frustrate, impede, or otherwise take any actions that are intended to or would adversely impact (i) the efforts of the Receiver, (ii) the receivership, (iii) the value of the Collateral; or (iv) the efforts of the Receiver to maximize the value of the Collateral (including

collection and monetization of all Accounts Receivable owing to the Defendants), and all such parties shall reasonably cooperate with the Receiver in connection with the foregoing; provided, however, nothing herein shall preclude any party with standing from seeking to modify the immediately preceding injunctive relief granted by this Court, after notice and a hearing; and

**IT IS FURTHER ORDERED** that the Receiver shall have the authority to take custody, control, and possession of the Receivership Assets with the full power to institute any actions or proceedings to obtain or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Assets, and all such actions can be filed in this Court; any actions sought by creditors against the Receiver, the Receivership Assets, or that in any way interferes with the Receivership actions hereunder shall be filed in this Court; and

**IT IS FURTHER ORDERED** that the Receiver, with the assistance of Sheriffs in Texas, Arizona and in the "Other Jurisdictions" shall have the full authority to enter onto and secure any premises, wherever located or situated to take possession, custody, or control of or to identify the location or existence of the Receivership Assets; all Courts within Arizona and the Other Jurisdictions shall give full faith and credit to this Order; and

**IT IS FURTHER ORDERED** that creditors and all other persons are hereby restrained and enjoined from commencing any action to interfere with or impede the activities and actions of the Receiver hereunder and his efforts to take exclusive control of the Receivership Assets; provided, however, nothing herein shall preclude any party with standing from seeking to modify the immediately preceding injunctive relief granted by this Court, after notice and a hearing; and

**IT IS FURTHER ORDERED** that the United States Postal Service is hereby authorized and ordered to turn over to the Receiver all inbound mail (including mail held by the United States Postal Service prior to this date) addressed to any of the Defendants pending further Order

of this Court.  This authorization extends to mail in the name of any of the above-referenced Defendants at any one of the above-referenced business locations, but this Order does not extend to mail addressed to any other person even if it is at such locations; and

**IT IS FURTHER ORDERED** that the Receiver shall release and deliver to Drake Genna all mail unrelated to:  (i) the collection, preservation, monetization or control of the Collateral; or (ii) any claims related to or against the Collateral (collectively, the "Unrelated Mail"), within three (3) business days of the Receiver's receipt and actual possession of the Unrelated Mail; and

**IT IS FURTHER ORDERED** that each of the Defendants shall within three (3) business days of such Defendant's receipt and actual possession of any mail, addressed to such Defendant, or any mail otherwise helpful or of any value to the Receiver in connection with the Receiver's fulfilling his obligations under this Order, turn over the same to the Receiver appointed by this Court; and

**IT IS FURTHER ORDERED** that the Receiver shall file a report with this Court, and serve copies of same upon counsel for the Plaintiff and the Defendants, within sixty (60) days of the entry of this Order summarizing the activities of the Receiver; and

**IT IS FURTHER ORDERED** that the appointment of the temporary receiver shall continue through the time of final trial of this case at 9:00 o'clock a.m. on the 5th day of October , 20 20; and

**IT IS FURTHER ORDERED** that the Receiver shall request a hearing from this Court within thirty (30) days of the Receiver's sale or disposition of all of the Collateral, to determine the necessity for the continuation of these receivership proceedings.

## II.   FURTHER FINDINGS AND TEMPORARY RESTRAINING ORDER AGAINST THE DEFENDANTS

35.   The Plaintiff has requested that the Court enter a temporary injunction to preserve the status quo pending a trial on the merits and to prevent the Defendants' sale, transfer, or further encumbrance of the Collateral.

36.   In addition to the findings set forth above, the Court finds as follows:

A.   It is apparent from the Original Petition and based on the findings set forth herein that immediate and irreparable injury, loss, and/or damage could result to the Plaintiff by virtue of the diminution of, waste of, or material injury to, its Collateral.

B.   Due to the nature of the Collateral and the circumstances more fully described above, there is a grave and immediate risk of diminution in the value of, the loss or waste of, or material injury to, the Collateral -- many portions of which require regular servicing and maintenance.

C.   Unless the requested temporary restraining order issues, the Defendants, which have been in default of the Credit Agreement since October, 2018, and have, to this point, failed to cure the default, might have the power to sell, transfer, dispose of, or otherwise encumber the Collateral before a hearing can be had on the Plaintiff's application for temporary injunction, and the Plaintiff justifiably fears that due to the Defendants' continued inability to meet their obligations, the Defendants will not be able to satisfy any such obligations except through the collection of Collateral.   Thus, the Plaintiff has no adequate remedy at law.   Injunctive relief is appropriate to preserve the status quo and to prevent the diminution in the value of, the loss or waste of, or material injury to, the Collateral.

D.   In the absence of a temporary restraining order, the Plaintiff may suffer irreparable harm inasmuch as: (a) the Collateral is the only known, available, and realistic source of repayment of the more than $140 million owed by the Defendants to the Plaintiff; and (b) to the extent that such Collateral is not serviced and maintained, the value of the Collateral will be threatened.  Specifically, if commission of the acts described above is not restrained and enjoined immediately, the Plaintiff may suffer irreparable injury, because the value of the Collateral could be diminished in a manner that will be difficult to measure.

E.   The Plaintiff has no adequate remedy at law to preserve the value and secure the return of its Collateral, and monetary damages will be insufficient to fully compensate the Plaintiff for the loss or diminution in value of its Collateral because the Defendants are unlikely to be able to satisfy any money judgment obtained.  Accordingly, there is no other remedy that will fully and adequately preserve the Plaintiff's rights.  Only a temporary restraining order will protect the Plaintiff's rights.  Compared to the substantial risk to the Plaintiff's Collateral posed in the absence of a temporary restraining order and preliminary injunction, the potential harm to the Defendants is *de minimus*.  In accordance with the terms of the Credit Agreements and the Guaranty and Security Agreements, executed or joined by each of the Defendants, the Plaintiff is entitled to, upon the occurrence and continuation of an Event of Default all remedies available to the Plaintiff in law or in equity and to, among other things, the appointment of a receiver to take possession of and to manage all or any portion of the Collateral, and the Plaintiff may obtain such appointment without notice to, or demand upon any of the Defendants, on an *ex parte* basis before any court of competent jurisdiction, and without regard to the adequacy of the collateral as security for the Indebtedness.  The injunctive relief sought by the

Plaintiff is in furtherance of the preservation of the Collateral and to effectuate the authority of the Receiver. The Defendants are not injured by reason of the Plaintiff's enforcement of their prior agreements with respect to same. Absent immediate entry of a temporary restraining order, the Collateral is in substantial danger of being permanently lost, removed, disposed of, or materially injured.

**IT IS, THEREFORE, ORDERED** that, until further ordered by this Court, each of the Defendants, their agents, managers, professionals, attorneys, or any other person or entity of whom the Defendants may have authority or control, are hereby restrained and enjoined from selling, transferring, disposing, or otherwise encumbering or affecting all of the assets of the Defendants, to protect the Plaintiff's interests in the Collateral; further, each of the Defendants, their agents, managers, professionals, attorneys, or any other person or entity of whom the Defendants may have authority or control, shall fully cooperate with the Receiver to close any sale transactions consistent with the terms hereof, so long as the Receiver commits to compensate them for the time spent and reimburse them for all expenses incurred in doing so, in accordance with the Approved Budget; and

Upon the ground that the Plaintiff has valid, genuine, first-priority, and continuing liens on and security interests in the Collateral, and all proceeds thereof, which is the subject of the action herein, and there is immediate and substantial danger that the Collateral could be lost, destroyed or wasted, diminished in value, or materially injured, **IT IS FURTHER ORDERED** that, until further ordered by this Court, each of the Defendants, and all persons acting under any of their authority and control or in concert or privity with any of them, are hereby restrained from withdrawing, depleting, causing the waste of, removing, spending, selling, transferring, further encumbering, tampering with, or otherwise affecting the Collateral in whole or in part; and

     **IT IS FURTHER ORDERED** that Plaintiff's Application for Temporary Injunction as contained in the Original Petition, be heard before this Court at 4:30 o'clock p.m. on the 7th day of October, 2019, in the courtroom of the 44th Judicial District Court in and for Dallas County, Texas; and

     **IT IS FURTHER ORDERED** that the Plaintiff shall, in accordance with Rule 684 of the Texas Rules of Civil Procedure, file a bond with the Dallas County District Clerk's Office in the amount of $2,500.00.

     **IT IS SO ORDERED** at 6:40 o'clock p.m. on this 24th day of September, 2019.

                                   JUDGE PRESIDING

**ORDER SUBMITTED BY:**

**K&L GATES LLP**

By: _____
    David Weitman, Esq.
    State Bar No. 21116200
    david.weitman@klgates.com
    Christopher A. Brown, Esq.
    State Bar No. 24040583
    chris.brown@klgates.com

1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone:  (214) 939 5500
Fax:  (214) 939 5849

**ATTORNEYS FOR PLAINTIFF,
BBVA USA, AS AGENT**

## EXHIBIT "A"

### Locations of Collateral

| Defendant | Site | Address | City/State | Landlord/Lien Holder | Lease Description/Real Estate Recording Office Information |
|---|---|---|---|---|---|
| Nobilis Health Marketing LLC | Leased | 8080 Park Lane | Dallas, Texas | Northwood PL Holdings LP | Business Office |
| Northstar Healthcare Surgery Center - Scottsdale, LLC | Leased | 9377 East Bell Road, Suites 131, 201, 207, and 225 | Scottsdale, Arizona | McDowell Mountain Medical Investors, LLC | Surgery Center |
| Northstar Healthcare Acquisitions, L.L.C. | Leased | 11700 Katy Freeway, Suite 300 | Houston, Texas | FSP Energy Tower I Limited Partnership | Corporate Headquarters |
| Marsh Lane Surgical Hospital, LLC | Leased | 2301 Marsh Lane | Plano, Texas | FAEC Holdings (TX), LLC | Hospital |
| Northstar Healthcare Acquisitions, L.L.C. | Leased | 7324 Southwest Freeway | Houston, Texas | The Arena Group, LP | Business Office |
| Hermann Drive Surgical Hospital, LP | Leased | 2001 Hermann Drive | Houston, Texas | HCII-2001 Hermann Drive, LLC | Hospital |
| Nobilis Arizona Holding Company, LLC | Leased | 1727 West Frye Rd. | Chandler, Arizona | Willis and Melrose LLC | Medical Office |
| Nobilis Arizona Holding Company, LLC | Leased | 6320 West Union Hills | Glendale, Arizona | Arrowhead Health Center, LLC | Medical Office |
| Nobilis Arizona Holding Company, LLC | Leased | 9377 East Bell Rd. | Scottsdale, Arizona | McDowell Mountain Medical Investors, LLC | Medical Office |
| Phoenix Surgery Center, LLC | Leased | 20045 North 19th Ave, | Phoenix, Arizona | 19th Avenue and 101, LLC | Surgery Center |
| NHC Arizona Professional Associates, LLC | Leased | 5585 North Oracle Rd. | Tucson, AZ | Oracle Professional Investments, LLC | Surgery Center |
| NHC Arizona Professional Associates, LLC | Leased | 15571 North Reems Rd. | Surprise, Arizona | LPW Properties, LLC | Surgery Center |
| NHC Arizona Professional Associates, LLC | Leased | 1475 West Chandler Blvd. | Chandler, Arizona | Chandler Professional Investments, LLC | Surgery Center |
| Nobilis Vascular | Leased | 23510 Kingsland | Katy, Texas | Star 2012 | Medical Office |

| | | | | | |
|---|---|---|---|---|---|
| Texas, LLC | | Blvd | | Development 2012, LP | |
| Nobilis Vascular Texas, LLC | Leased | 19701 Kingwood Dr. | Kingwood, Texas | BPROP TX KINGWOOD 19701, LLC | Medical Office |
| Nobilis Vascular Texas, LLC | Leased | 1650 Round Rock Ave. | Round Rock, Texas | Westbank Development, LLC | Medical Office |
| Nobilis Vascular Texas, LLC | Leased | 19016 Stone Oak Parkway | San Antonio, Texas | WMPT Stone Oak, L.P. | Medical Office |
| Nobilis Vascular Texas, LLC | Leased | 9323 Pinecroft | The Woodlands, Texas | HEDE FLP | Medical Office |
| Nobilis Vascular Texas, LLC | Leased | 4690 Sweetwater | Sugar Land, Texas | FCB Fort Bend Holdings, LLC | Medical Office |
| Nobilis Vascular Texas, LLC | Leased | 251 Medical Center Blvd. | Webster, Texas | 251 Medical Center, LLC | Medical Office |
| Marsh Lane Surgical Hospital, LLC | Leased | 6957 West Plano Parkway | Plano, Texas | HCRI Prestonwood Medical Facility, LLC | Medical Office |
| Northstar Healthcare Acquisitions, L.L.C. | Leased | 14555 N. Scottsdale Road | Scottsdale, Arizona | 14555 Scottsdale Road, L.P. | Business Office |
| First Nobilis, LLC | Leased | 4801 Bissonnet Street | Bellaire, Texas | Lenox Hill Holdings, Ltd. | Hospital |
| First Nobilis, LLC | Leased | 4811 Bissonnet Street | Bellaire, Texas | Lenox Hill Holdings, Ltd. | Business Office |
| First Nobilis, LLC | Leased | 411 N. First Street | Bellaire, Texas | First Street Holdings, Ltd. | Surgery Center |
| Perimeter Road Surgical Hospital, LLC | Leased | 17500 N. Perimeter Drive | Scottsdale, Arizona | North Perimeter, LLC | Hospital |
| Bellaire Surgical Hospital Holdings, LLC | Leased | 3750 Medical Park Drive | Dickinson, Texas | The Jilia R. Amaral Trust - 1993 | Surgery Center |
| Nobilis Uptown Holding, LLC | Leased | 1190 N. Haskell Ave. | Dallas, Texas | CSRA/Kay Dallas MOB Master Lessee, LLC | Surgery Center |